1

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF WASHINGTON
2

EMPIRE HEALTH FOUNDATION,          ) Case No. 2:17-CV-209-SMJ
3                                   )
                    Plaintiff,      ) December 7, 2017
4                                   )
v.                                  ) Richland, Washington
5                                   )
CHS/COMMUNITY HEALTH SYSTEMS,       ) Motion Hearing
6   et al.,                         )
                                    ) Pages 1 to 22
7   _____Defendants.__

8

            BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
9                UNITED STATES DISTRICT COURT JUDGE

10

                        APPEARANCES:
11

For the Plaintiff:          Eleanor Hamburger
12                          Ehamburger@sylaw.com
                            Richard E. Spoonemore
13                          Sirianni Youtz Spoonemore
                            Hamburger
14                          701 Fifth Avenue
                            Suite 2560
15                          Seattle, WA 98104
                            206-223-0303
16

For the Defendants:         Stellman Keehnel
17                          Stellman.keehnel@dlapiper.com
                            Anthony Todaro
18                          DLA Piper US LLP
                            701 Fifth Avenue
19                          Suite 7000
                            Seattle, WA 98104
20                          206-839-4888

21  Official Court Reporter:    Kimberly J. Allen, CCR #2758
                                United States District Courthouse
22                              P.O. Box 685
                                Richland, Washington 99352
23                              (509) 943-8175

24  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.
25

 1    (December 7, 2017; 11:36 a.m.)

 2         THE COURTROOM DEPUTY:  Please rise.

 3       (Call to Order of the Court.)

 4         THE COURT:  Please be seated.

11:36:18  5         THE COURTROOM DEPUTY:  Matter before the Court is *Empire*

 6    *Health Foundation v. CHS/Community Health Systems, Incorporated*,

 7    Cause No. 17-CV-209-SMJ.  Time set for motion hearing.

 8         Counsel, starting with plaintiff, please state your

 9    presence for the record, and please use the microphones.

11:36:37 10         Thank you.

11         MS. HAMBURGER:  Good morning, Your Honor.  My name is

12    Eleanor Hamburger, Sirianni, Youtz, Spoonemore, Hamburger,

13    representing Empire Health Foundation.  And to my right is Rick

14    Spoonemore, also with my law firm; and Sarah Lyman, representing

11:36:55 15    Empire Health Foundation.

16         THE COURT:  Good morning to all three of you.

17         MR. SPOONEMORE:  Good morning.

18         MR. KEEHNEL:  Good morning, Your Honor.  Stellman

19    Keehnel from the Seattle office of DLA Piper.  With me today is

11:37:07 20    my partner, Anthony Todaro, representing defendants.

21         THE COURT:  Good morning to you, too.

22         I guess I was expecting to hear that based upon your

23    drive here together that you were able to work out all your

24    differences and have come here to just tell me that all matters

11:37:24 25    have been resolved.

1          Is that not the case?

2          MR. KEEHNEL:  Well, I paid for the cab.  I

3    expect that we'd be --

4          THE COURT:  Now, why would you say that?

11:37:34  5          Very well.  Counsel, before the Court are motions.

6          Who would like to go first?

7          MR. KEEHNEL:  It's our motion, Your Honor.

8          THE COURT:  Yes.

9          MR. KEEHNEL:  I'll be happy to go first.

11:37:44  10          THE COURT:  Very well.

11          MR. KEEHNEL:  We only have two subjects today, having

12    narrowed through our reconsideration motion just to the two

13    issues, and that is whether the certificate of need, the CON,

14    constitutes a, quote, change in legal requirements, close quote,

11:38:06  15    within the meaning of the last sentence of 10.14.  And then I

16    also want to address the statute of limitation issue.

17          THE COURT:  Okay.

18          MR. KEEHNEL:  So, Your Honor, it's our position, it's

19    defendant's position that for, really, four separate reasons the

11:38:18  20    CON is not a change as contemplated by that last sentence of

21    3.14.  That is, the sequence of events; the text itself; that if

22    you read the APA as a whole, the asset purchase agreement as a

23    whole, you come to the same conclusion; and, finally,

24    plaintiff's acknowledgment that the parties had contemplated

11:38:38  25    pre-contracting that the CON may impose a charity care

*Empire Health Foundation vs. CHS, et al./2:17-CV-209-SMJ*
*Motion Hearing/December 7, 2017*                                                4

1    obligation vis-a-vis the state.

2          THE COURT:  Okay.

3          MR. KEEHNEL:  So let me touch those -- on those in the

4    same order I introduced them.

11:38:54  5          The sequence.  So we know the -- the sequence is that in

6    October 2007, the APA is signed.  We have a typo on the first

7    page --

8          THE COURT:  Right.

9          MR. KEEHNEL:  -- of our closing brief.  It says

11:39:07  10   September.  It's, of course, October.

11         THE COURT:  Okay.

12         MR. KEEHNEL:  August 2008, a year later, the CON is

13   issued.

14         THE COURT:  Right.

11:39:13  15         MR. KEEHNEL:  Two months later there's actually a

16   transaction that's --

17         THE COURT:  Right.

18         MR. KEEHNEL:  -- consummated.

19         What that means is that my clients had no involvement

11:39:22  20   with the hospital whatsoever, no -- two hospitals, no -- no

21   obligations whatsoever until they actually took over the

22   hospitals.  There's nothing they could do.  They were powerless

23   vis-a-vis the hospitals.

24         So it's illogical to say that the CON issuing two months

11:39:38  25   before my clients had any role in the hospitals could be a

1    change in the legal requirements.  My clients had no charitable

2    care obligations whatsoever until they actually took possession

3    of the hospitals.  That's the essence of the motion.  And so we

4    think the sequence by itself is dispositive.  Your legal

11:39:58  5    requirements don't change if you have no legal obligations

6    whatsoever.  We had no legal obligations whatsoever unless the

7    transaction actually closed.

8          THE COURT:  So, in general, I guess, for contracts such

9    as these that are sort of more complex, involved, that take a

11:40:17  10    significant period of time to implement -- rather, to close,

11    parties then are expected, is what you're saying, to monitor

12    changes in the law, changes in situation; they're required to do

13    those sorts of things.

14          Is that -- is that essentially what you're saying?

11:40:37  15          MR. KEEHNEL:  That's maybe one way of saying it.

16    Here's -- a better way of saying it -- and I'll come back to --

17    my second argument was going to be the text itself.  Let me come

18    to that third, because let me jump into the APA structure

19    itself.  I think that will help the Court.

11:40:50  20          So -- I have to jump into the text just for a second.

21          THE COURT:  That's fine.

22          MR. KEEHNEL:  The first -- the first five words of the

23    text of 3.14 are "as of the closing date."  The obligations

24    in 3. -- in 10. -- excuse me, 10.14, the obligations in 10.14

11:41:12  25    are, quote, as of the closing date.  In other words, that

1    provision doesn't kick in until the closing date.  There's

2    just -- plaintiff would have you erase those words and say

3    because the parties signed effective October 2007, a year prior,

4    that we can erase those words, "as of the closing date."  Those

5    words have to mean something.

6         The Court, under Washington rules of statute -- of -- of

7    contract interpretation, can't just erase those five words.

8    They have to mean something.

9         THE COURT:  I guess I don't -- I don't see the -- I

10   don't see the plaintiffs arguing that those are -- are being

11   erased.  They're arguing something else.  And I'm -- I believe I

12   know what they're going to argue, and they're going to tell me

13   in a second, but aren't they arguing something else?

14        MR. KEEHNEL:  But they have to ignore those words to get

15   to where they want to go.  If those words mean anything, they

16   mean there is no obligation under 3 -- under 10.14 until the

17   closing date, and that means the -- the adoption or the issuance

18   of the CON did not happen after there was a legal obligation.

19        If your legal obligation only kicks in as of the closing

20   date, then the CON happened before you had a legal obligation.

21   If your legal obligation kicked in before, because, for example,

22   that language wasn't there, it didn't say "as of the closing

23   date," we'd have a different story maybe.

24        Now let me jump into the APA generally.  So the APA kind

25   of has two -- has a structure of two parts.  Most of the APA is

11:41:32
11:41:45
11:42:00
11:42:23
11:42:40

1  written in a way that it only kicks in as of the closing date.

2  There are a handful of provisions that are called out explicitly

3  that impose legal obligations on the parties between the time of

4  signing and the closing, and they're called out very explicitly.

11:43:03  5  For example, Section 5 is called, quote, covenants of seller

6  prior to closing, close quote.  Section 6, quote, covenants of

7  buyer prior to closing.

8       Those are the covenants that my client had to take care

9  of prior to closing.  Those were our legal obligations prior to

11:43:26  10  closing.  In Section 6, which identifies what our obligations

11  were prior to closing, what legal obligations we had, what

12  duties we had, there's not a word about charity care.  When you

13  get to charity care, that kicks in as of the closing date.

14  That's when our legal obligation began.

11:43:43  15       Indeed, the whole contract is really kind of structured

16  in a way that if you look at Section 1, which Section 1 runs

17  nine pages, it's the guts of the contract, it covers what is

18  being purchased and for how much, it starts out, "as of the

19  closing."

11:44:01  20       The principal obligations of the parties only kick in as

21  of the closing.  There are relatively few obligations -- some by

22  the seller, some by my clients, the buyers -- which kick in

23  before.  And when they kick in before, the drafters of that

24  contract were absolutely explicit to say that these obligations

11:44:22  25  will apply to you even though you haven't had a closing; these

1    are the ones that you have to do; these are true legal

2    obligations, despite the fact that the transaction has not been

3    consummated.  You get the pattern.

4         So when we get to 10.14, which way did the contract

11:44:38  5    drafters go?  Did they say that's going to be your legal

6    obligation from day one, from October 2007?  Or did they instead

7    say that will be your legal obligation commencing at closing?

8    They chose the latter.  They said you don't have a legal

9    obligation until October 2008 when we close the transaction.

11:44:59  10         And, therefore, the CON is not a change.  The CON is a

11    preoccurrence event.  It does not happen after my client assumed

12    an obligation.

13         THE COURT:  Counsel, why would you think that your

14    client would be obligated to do those things until they actually

11:45:16  15    have the -- until the contract is consummated?  I mean, I

16    guess -- closed, I should say.  I mean, I -- I'm not sure I'm

17    following your argument.

18         MR. KEEHNEL:  You're right.  That's the whole point of

19    the sequence.  My client couldn't have obligations under 10.14

11:45:35  20    unless and until the contract closed.  And the parties made that

21    crystal-clear by saying your obligations in 10.14 only apply as

22    of the closing.

23         THE COURT:  Okay.

24         MR. KEEHNEL:  That is the sequence.

11:45:47  25         And my fourth point on -- on this principal argument is

1    that with the concession that's been made by plaintiff in the

2    briefing, namely that the parties, quote, understood before

3    contracting, before doing anything, that the CON may well

4    include a charity care element, with the parties having had that

11:46:15   5    in their minds and having not put it into the contract, that

6    shows how clear it is that they were not contemplating, by

7    10.14's last sentence, to sweep up the CON into an obligation

8    under 10.14.  Because when the parties had contemplated other

9    changes, for example, in the collective bargaining agreement,

11:46:39   10    you'll recall in Section 1.5, they talk about the possibility

11    that there are going to be some changes, and what they say is

12    we're going to add that to the contract; that's going to be part

13    of the contract.  We know that might happen, it's in our minds;

14    it's in the contract.

11:46:54   15         Here, what plaintiff is telling us is it was all the

16    same with respect to the CON.  The parties knew that they might

17    well have this charity requirement in the CON, that the CON was

18    going to issue before the -- the effective -- before 10.14

19    kicked in, but there the parties didn't say in 10.14:  And you

11:47:18   20    have to satisfy any requirements regarding charity obligation

21    imposed vis-a-vis the state; we're going to make that a part of

22    the private contract also.

23         It makes no sense that the parties would know of certain

24    contracts coming down the pike, or certain requirements coming

11:47:33   25    down the pike, include them in places in the contract, saying

1    we're going to include these as part of our contractual

2    relationship, and know the CON and not do the same and somehow

3    have intended to include that under 10.14.  Your Honor, that

4    just doesn't make sense.  That just doesn't make contractual

11:47:54    5    sense.

6            And we had -- we had super sophisticated lawyers on this

7    project.  We had one of the nation's leading persons out of

8    Drinker Biddle in Chicago representing the seller.  The parties

9    acknowledged they were both sophisticated parties, well-versed

11:48:10   10    clients, you know, sophisticated clients; very expert lawyers.

11    And the notion that the parties meant, having contemplated that

12    the CON would have a charity care requirement, that the parties

13    only meant to sweep that up via the -- the language in the last

14    sentence of 10.14 and not call it out explicitly, that defies

11:48:33   15    logic.  No lawyer would do that.  No sophisticated party would

16    do that.  People don't do that.  They write contracts in an

17    explicit way.

18            They knew how to do that.  They did it with respect to

19    collective bargaining.  There is no reason to believe that the

11:48:48   20    parties here intended to sweep up the CON's buyer-to-state

21    requirement and put it in as a matter of private contract under

22    the last sentence of 10.14.  That just doesn't make sense.  Not

23    from timing, not from the text, not from the structure of the

24    APA, and certainly not given that the parties had explicit

11:49:09   25    foreknowledge before contracting that the CON may well have that

1    requirement.

2          THE COURT:  Thank you, Counsel.  I think you're out of

3    time.  If there's one --

4          MR. KEEHNEL:  Could I just say a couple words on SOL?

11:49:20    5          THE COURT:  Actually, no.  Let's skip that argument.

6          MR. KEEHNEL:  I have some important things if we have

7    some time at the end.

8          THE COURT:  Thank you.

9          MS. HAMBURGER:  Good morning, Your Honor.

11:49:34    10          THE COURT:  Good morning.

11          MS. HAMBURGER:  May it please the Court.  I'm Ellie

12    Hamburger.

13          I've provided you with an outline of our presentation,

14    which I've also provided to defense counsel in advance.

11:49:46    15          First off, you know, on a motion for reconsideration,

16    it's -- they're generally disfavored, and they're only granted

17    in highly unusual circumstances, such as a change of law or new

18    evidence that couldn't have been presented before.  And none of

19    those unusual circumstances exist here.

11:50:06    20          Moving on to the issue about whether 10.14 includes the

21    CON, the conditions in the CON as changes in legal requirements,

22    the Court's ruling on that was absolutely correct.  And the

23    defense counsel ignores the key date here is that date that the

24    contract became effective.  That's October 10th, 2007.  It's on

11:50:36    25    Page 1 of the contract.

1       And what became effective on that date are the

2   requirements imposed on CHS in 10.14 that, when it took control

3   of the hospitals, it was obligated to use best efforts to

4   provide historic levels of charity care.

11:50:58   5       Now, that -- that obligation was in place and effective

6   on October 10th, 2007.  The performance of that obligation did

7   not take place until the hospitals were under CHS's control, but

8   the legal obligation is effective on the plain language of the

9   contract starting in October 2007.

11:51:24   10       Now, that language included the last sentence:  Subject

11   in all respects to changes in legal requirements, governmental

12   guidelines, or policies.  And that last sentence is important.

13   It was included to make sure that if there was a governmental

14   guideline, policy, or law that had a different requirement, the

11:51:49   15   contract would be synchronized with that charity care

16   requirement.

17       So fast-forward to August.  The Department of Health

18   here in Washington offered a conditional CON to CHS that said

19   we'll let you have it, but you have to agree to this increased

11:52:09   20   amount of charity care.

21       CHS writes back, yes, we agree.

22       And then on August 29th, the CON was issued, and that

23   increased CHS's legal requirement to provide charity care after

24   it took care of the hospitals.

11:52:25   25       THE COURT:  But you're in the middle of negotiations

1   with sophisticated parties on both sides.

2         MS. HAMBURGER:  Yes.

3         THE COURT:  Why isn't that a persuasive argument that

4   you should have written that into your -- your agreement?

11:52:39  5         MS. HAMBURGER:  It is written in, in the exact, precise

6   language, the last sentence of 10.14.  It says:  Subject in all

7   respects to changes in legal requirements.

8         Any sophisticated lawyer, any lawyer would read that and

9   understand that that not only includes changes on the federal

11:53:04  10  level, but it also includes requirements imposed by the state

11  regulator for charity care that would be imposed on CHS when

12  it's running the hospitals.

13        And of course the sophisticated attorneys negotiating

14  this want to make sure that CHS is not whipsawed between two

11:53:25  15  different standards.  The idea here is to synchronize the two

16  standards, make them the same, and that's why the "subject to"

17  language is in there.  Otherwise, if the "subject to in all

18  respects" -- and "all" is very important there, in every

19  respect, whether it's anticipated or unanticipated changes in

11:53:45  20  legal requirements --

21        THE COURT:  Well, what about the argument that 10.14 has

22  also language of "as of the closing date"?

23        MS. HAMBURGER:  Right, but that's because both the CON

24  and -- the original contract and the CON both recognize that

11:54:01  25  performance of charity care can only happen after CHS takes

1    control.  But the legal commitment, the legal requirement was

2    imposed first by contract as "best efforts at historic levels"

3    starting in 2007 when CHS agrees.  Then it's modified, it's

4    changed when the Department of Health comes in and says, no,

11:54:27    5    that's not good enough.  It has to be at regional levels.  The

6    legal requirements, not the performance, but the actual legal

7    requirements was first imposed in October 2007, and then it's

8    modified by the CON in August 2008.  And that is -- it is a

9    change.  It is a change from the initial standard in the

11:54:53   10    contract to a new standard.  And it's designed to synchronize

11    the required care for the hospitals so there's one standard by

12    which they have to apply.

13          You know, the argument that the sophisticated lawyers

14    weren't monitoring this issue is -- is baseless.  A

11:55:16   15    sophisticated lawyer would look at that last sentence and say,

16    "Yes, we're taken care of."  When the Department of Health comes

17    in and says, as they've done in other CONs, "You have to provide

18    charity care at the regional level," we know it's going to sweep

19    it up.  Sophisticated lawyers know that this clause at the end

11:55:35   20    of 10.14 ensures that a single charity care obligation is

21    imposed and is enforceable.

22          Briefly on the statute of limitations, Your Honor, the

23    defendants argue that the standard just focuses on efforts.  But

24    that's not true.  The very -- the primary threshold issue in

11:56:02   25    whether CHS has met its charity care obligation is whether it

1    has provided charity care at or exceeding the regional level.

2    That can be only measured on an annual basis, after the

3    information is reported to the Department of Health and made

4    public.  There's no other way Empire could monitor and evaluate

11:56:26    5    whether performance on an annual basis is met.

6            THE COURT:  Okay.  Counsel, I don't need to hear --

7            MS. HAMBURGER:  Okay.

8            THE COURT:  -- on the statute.

9            MS. HAMBURGER:  Unless Your Honor has other questions on

11:56:37    10    10.14, then I'll --

11            THE COURT:  Thank you.

12            MS. HAMBURGER:  Thank you.

13            THE COURT:  You said you had a couple other things.

14            MR. KEEHNEL:  Well, I would talk about the statute of

11:56:49    15    limitations a little bit, but I know that's not really why

16    you -- you really wanted to hear us on the first argument.

17            THE COURT:  I did.

18            MR. KEEHNEL:  And I'm just going to say one more word on

19    that, and then maybe two words on the statute of limitations.

11:57:03    20            I'm 63 now.  I've practiced commercial law my whole

21    life.  I'm not here as a witness.  But, Your Honor, you've been

22    in the commercial law environment, too.  You and I came from

23    slightly different paths --

24            THE COURT:  Counsel, I have a feeling you have a

11:57:19    25    tremendously larger amount of experience in this area than I do.

1    MR. KEEHNEL:  But you see a lot of cases.  I mean, my

2    cases go on for years at a time, and sometimes they're big.  But

3    I rub shoulders a lot with the commercial lawyers, the people

4    who draft these agreements.  I'm not here to testify.  But I

11:57:34  5    think you and I both know that Keith Anderson, if he really

6    meant to -- to impose on my clients, as he's representing the

7    predecessor to plaintiff here, if he really, sitting in his

8    office in Chicago, Drinker Biddle, one of the world's renowned,

9    you know, healthcare transaction lawyers, if he wanted -- he

11:57:56  10   knew about the CON -- we know that -- he knew it was probably

11   going to have this charity care requirement.

12        Do you think he wouldn't be involved in dereliction of

13   his duties if he hadn't said "and we're going to have that be a

14   part of the agreement," as opposed to relying upon this muck at

11:58:14  15   the end of 10.14?

16        You and I both know that they were not contemplating

17   that the CON was going to become part of this contract.  It's

18   just a reality.

19        THE COURT:  Well, that's true.  I also understand people

11:58:24  20   sometimes are not as clear as they can be in contracts than

21   perhaps they should be.

22        MR. KEEHNEL:  Well, this contract is -- is pretty clear.

23   There's a lot of -- there's a lot of ink thrown on those pages.

24        Two words on --

11:58:35  25        THE COURT:  Well, I think this litigation is clear

1    evidence of the contrary.  I think -- I think there are

2    reasonable interpretations on both sides.  I don't want to

3    discount the arguments that you or your clients have made on

4    this point.  I think they're good arguments.

11:58:57    5          So I guess I'll just say that.

6          MR. KEEHNEL:  So on statute of limitation, this notion

7    that by the CON a one-year-by-one-year requirement was imposed

8    for satisfying the reasonable effort standard, it just doesn't

9    make sense.

11:59:17   10          If you look at the face of the CON itself, which is what

11   plaintiffs are asking you to look at to come up with this

12   supposed imposition of a one-year-by-one-year performance

13   standard, it's not there.  It's just not there.

14          There is a reference to averages, right?  Reasonable

11:59:35   15   efforts to try to -- to reach a reasonable -- or a regional

16   average.  But nowhere does it say "and we're going to measure

17   that each year at a particular time."

18          Indeed, as you know from our papers, the fiscal years of

19   hospitals around the state that report to the state, there are

11:59:53   20   six different fiscal year-ends that are used.  The state does

21   not actually produce an amalgamated annual report number.  The

22   state kind of throws a dart at the dartboard.  There is no such

23   magical, this is the annual number.

24          And the state, as you saw in our papers, acknowledges

12:00:12   25   you can't rely on these numbers for being, really, what the

1    hospitals have done because a lot of what the hospitals' efforts

2    are in free care and low-cost care don't get captured by the

3    numbers.

4         The state wouldn't come to you today and say, "The --

12:00:30    5    the regional numbers that we report are reliable to show on an

6    annual basis for all hospitals in the region what their actual

7    charity care levels were."  The state wouldn't do that.  The

8    state wouldn't do that because the state in its reports that

9    you've seen, because we put them in front of you and quoted to

12:00:50   10    you, have said, to the contrary, "Don't rely on them."  I mean,

11    explicitly.  That they're -- that they're misleading.

12         (Reading):  Comparisons based solely on data included in

13    this report can result in misleading findings.  That's in the

14    state's 2015 report to Todaro dec Exhibit G at 238.

12:01:11   15         The notion that you're going to splice from the fact the

16    state does put out annually some numbers, which it doesn't say

17    actually establish what the true numbers are, that that somehow

18    silently creates an annual,

19    we're-only-going-to-measure-you-every-12-months obligation on

12:01:32   20    behalf of my client -- it's not written in there.

21         This is an obligation that attached to my client on day

22    one, to make reasonable efforts from that point forward.  We

23    think they did.  Plaintiff thinks they didn't.  In fact,

24    plaintiff has gone out on a limb and said, "Buyers, you never

12:01:50   25    did."

1          And the combination of the accusation that we never

2    did -- that's a pled accusation -- and the fact that the

3    contract is not set up in that annual, sequential way,

4    establishes the statute ran long ago, long before this lawsuit

12:02:10   5    was filed.

6          At one point plaintiff also made reference to the fact

7    that there is an informational reporting requirement in 10.14.

8    You know who that report goes to?  The board of trustees.

9    There's nothing in the contract that says that report is going

12:02:23   10   to go to the seller or the seller's successor.  It goes to a

11   board of trustees.

12         Who picks the board of trustee members?  My clients.

13   There's no obligation for anybody from Empire or from the

14   Foundation to be on that board.  There can be three community

12:02:38   15   members.  They don't have to be from the Foundation.  They don't

16   have to be from anyplace other than people we want.  That's the

17   only person who gets those reports.  They're informational

18   reports.

19         And how do we know that that also doesn't set up a

12:02:51   20   sequential obligation, even though the report has to be given

21   annually?  Because the contract itself in 10.14 says for ten

22   years why don't you give us these reports.  10.14 establishes a

23   perpetual obligation of my client to make best efforts -- or

24   make, whatever it is, reasonable efforts.  Sorry.

12:03:12   25         If -- if that internal report, informational reporting

1    was what supposedly was going to be creating this annual

2    obligation, why does it end after ten years?  What happens in

3    the 11th year?  We don't have any obligation?

4          Of course we do.  10.14 says we have a perpetual

5    obligation.  It just shows that that annual internal report is

6    merely informational.

7          There is nothing in the contract, written by very

8    sophisticated parties, assisted by very sophisticated lawyers,

9    that says, "Your performance is going to be measured for

10   purposes of ascertaining a breach of 10.14 on the basis of an

11   annual determination."

12         THE COURT:  Thank you.

13         MR. KEEHNEL:  It's not there.

14         THE COURT:  Counsel, since I didn't allow you to address

15   the issues of statute of limitations and they were raised, would

16   you like to address those?

17         MS. HAMBURGER:  Your Honor, only if you have questions.

18         THE COURT:  What about this argument -- yes, I do.

19         What about this argument of this perpetual requirement

20   that he is raising?

21         MS. HAMBURGER:  So, Your Honor, the -- first of all, we

22   know the requirement has ended because they have sold the

23   hospital, right?  So the -- the -- the question about it being

24   into perpetuity is academic at this point.

25         We agree on the statute of limitations, and it ends when

12:03:30   5
12:03:43   10
12:03:55   15
12:04:25   20
12:04:44   25

1    the transaction closed in the sale to MultiCare.

2           Let me just say this, though:  The period is very

3    clearly a year.  It's clear that the information becomes

4    available annually and is reported, whether for informational

12:05:05    5    purposes or accountability purposes, to the trustees on an

6    annual basis.  It's clear in the CON itself.  In the CON that

7    the department issued they reference the annual regional average

8    that the hospitals were at in the Eastern Region at that time.

9           And so the measure based upon the CON itself is very

12:05:28   10    clear that it is an annualized periodic measurement because they

11    call out exactly what the measurement was at that time.

12           THE COURT:  Okay.  Thank you.

13           MS. HAMBURGER:  Thank you.

14           MR. KEEHNEL:  Could I just make one correction to that?

12:05:41   15    I think she misspoke unintentionally.

16           THE COURT:  Oh, okay.

17           MR. KEEHNEL:  I think she said -- I think she said the

18    CON refers to something annual.  It doesn't.  If you'll look at

19    Exhibit A, Page 2 of 6 and 3 of 6, it merely says the hospital,

12:05:57   20    quote, will use reasonable efforts to provide charity care in an

21    amount comparable to or exceeding the average amount of charity

22    care provided by hospitals in the Eastern Washington Region.

23    Currently the amount is 3.35 percent of adjusted revenue.

24           It doesn't say annual revenue.  It just says that's what

12:06:16   25    we're deeming the current level to be.  Doesn't say whether it's

1    the last six months, doesn't say whether it's a melded year,

2    doesn't say it's a two-year average.  There's nothing on the

3    face of the CON, which is what we have to look at, to try to

4    come up with some annual, we're going to measure you on an

12:06:33    5    annual basis.  Doesn't say that.

6              THE COURT:  Okay.

7              MS. HAMBURGER:  Your Honor, I just would direct your

8    attention to the actual August 29th CON Condition No. 3, and it

9    has the number of the regional average at the time in that

12:06:43    10    provision.

11              THE COURT:  All right.

12              Well, thank you.  I appreciate the arguments.  I

13    appreciate the briefing in this case.  And I would encourage you

14    to, in fact, book a cab on the way back to the airport; perhaps

12:07:01    15    further discussions can continue.

16              Thank you again for your presentations.

17              THE COURTROOM DEPUTY:  Please rise.

18              Court is adjourned.

19          (Hearing concluded at 12:07 p.m.)

20

21

22

23

24

25

1            C E R T I F I C A T E

2

3        I, KIMBERLY J. ALLEN, do hereby certify:

4        That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7            That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12        I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15        DATED this 8th day of January, 2018.

16

17

18                    */s/ Kimberly J. Allen*

19                    Kimberly J. Allen, CRR, RMR, RPR, CCR
                      Washington CCR No. 2758
20                    Official Court Reporter
                      Richland, Washington

21

22

23

24

25