FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 27, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| EMPIRE HEALTH FOUNDATION, a Washington nonprofit corporation,<br><br>               Plaintiff,<br><br>     v.<br><br>CHS/COMMUNITY HEALTH SYSTEMS INC., a Delaware corporation; SPOKANE WASHINGTON HOSPITAL COMPANY LLC, a Delaware limited liability company; and SPOKANE VALLEY WASHINGTON HOSPITAL COMPANY LLC, a Delaware limited liability company,<br><br>               Defendants. | No.   2:17-cv-00209-SMJ<br><br>**ORDER RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiff Empire Health Foundation sues Defendants CHS/Community Health Systems Inc., Spokane Washington Hospital Company LLC, and Spokane Valley Washington Hospital Company LLC (collectively "CHS") for breach of contract, alleging it failed to fulfill the charity care commitments it made in its 2008 acquisition of two Spokane area hospitals. ECF No. 1.

The Foundation moves for partial summary judgment solely on the issue of

whether CHS provided the amount of charity care contemplated by a condition in a state agency certificate, which the Court previously ruled is enforceable under the parties' contract. ECF Nos. 22, 36, 50. CHS moves for summary judgment, arguing the charity care condition is too indefinite and uncertain to enforce or, alternatively, CHS did not breach the charity care condition and the Foundation is not entitled to any remedy. ECF No. 59. The parties oppose each other's motions. ECF Nos. 58, 62. The Court held a hearing on both motions on February 26, 2019. After reviewing the record and relevant legal authorities, the Court denies both motions because genuine disputes over material facts abound, the contract is enforceable, and an equitable remedy is available.

## BACKGROUND

In 2007, Empire Health Services and CHS entered an Asset Purchase Agreement under which Empire Health Services sold Deaconess Medical Center and Valley Hospital and Medical Center to CHS. ECF No. 14-1. The Foundation is a nonprofit community health foundation formed from the proceeds of the sale. ECF No. 1 at 1. The Foundation received all of Empire Health Services' rights and obligations when it dissolved following the sale. *Id.*

Section 10.14 of the contract concerns "Indigent Care Policies." ECF No. 14-1 at 53–54. Section 10.14 provides,

> As of the Closing Date, Buyers shall adopt the indigent care policies of CHS attached as <u>Exhibit D</u> hereto, including the relevant provisions of

the billing and collections policy with respect to the indigent, which are at least as favorable to the indigent and uninsured as Seller's indigent care policy, including the relevant provisions of the billing and collections policy with respect to the indigent, for the Hospitals as Buyers' indigent care policy. No patient will be turned away because of age, race, gender or inability to pay. Buyers shall use best efforts to cause the Hospitals to continue to provide services to patients covered by the Medicare and Medicaid programs and those unable to pay for emergent or medically necessary care at levels similar to the historic levels of indigent care previously provided by the Hospitals. For a period of at least ten (10) years following the Closing Date, Buyers will provide the Board of Trustees with an annual report of their compliance with this <u>Section 10.14</u>. Buyers will also continue to provide care through community-based health programs, including cooperation with local organizations that sponsor healthcare initiatives to address identified community needs and improve the health status of the elderly, poor, and at-risk populations in the community. This covenant shall be subject in all respects to changes in legal requirements or governmental guidelines or policies (such as implementation of universal healthcare coverage).

*Id.*

Exhibit D's charity care policies, which section 10.14 cross-references, provide, "[i]n order to serve the health care needs of our community, and in accordance with RCW [Revised Code of Washington] 70.170 and WAC [Washington Administrative Code] 246-453, [each hospital] will provide 'Charity Care' to patients or the 'Responsible Party' without financial means to pay for 'Appropriate hospital-based medical services.'" ECF No. 14-2 at 14, 27. Exhibit D's charity care policies define eligibility and processes for identifying charity cases and providing or denying charity care. *Id.* at 14–19, 27–32.

Pursuant to the contract, CHS applied for Certificates of Need from the

Washington State Department of Health. ECF No. 18-1 at 2. The Department granted CHS's applications "pending agreement to the following conditions":

> [Each hospital] will provide charity care in compliance with the charity care policies provided in this Certificate of Need application, or any subsequent policies reviewed and approved by the Department of Health. [Each hospital] will use reasonable efforts to provide charity care in an amount comparable to or exceeding the average amount of charity care provided by hospitals in the Eastern Washington Region. Currently, this amount is 3.35% of the adjusted revenue. [Each hospital] will maintain records documenting the amount of charity care it provides and demonstrating its compliance with its charity care policies.

*Id.* at 2–3; *accord id.* at 5. The Department elsewhere described this condition as "requir[ing] CHS to increase the level of charity care to the regional average." ECF No. 63-7 at 41. CHS agreed to this condition. ECF No. 18-2 at 2, 4. Then, in 2008, the Department issued the Certificates of Need and approved the purchase of each hospital, subject to this condition. ECF No. 61-1 at 2; ECF No. 61-2 at 2.

The 3.35% figure was the average of the three most recent years of available data, from 2004 to 2006. ECF No. 63-1 at 93–94; ECF No. 63-5 at 4, 7; ECF No. 63-6 at 4, 7; ECF No. 63-7 at 6. While the 3.35% figure established the initial benchmark for providing charity care, the benchmark was subject to change based on subsequent years' data. ECF No. 63-1 at 94. The Foundation claims that, between 2011 and 2016, CHS failed to meet the benchmark. ECF No. 50. CHS disputes how the Foundation calculated the benchmark, provides an alternative calculation, and claims it approximated or exceeded the benchmark. ECF No. 59.

Section 12.23 of the contract, entitled "No Third Party Beneficiaries," provides, "[t]he terms and provisions of this Agreement are intended solely for the benefit of Buyers and Seller and their respective permitted successors or assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other person." ECF No. 14-1 at 65.

Section 12.24 of the contract, entitled "Enforcement of Agreement," provides,

> The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

*Id.*

In its complaint, the Foundation explains,

> This lawsuit seeks (1) injunctive relief and/or specific performance to require Defendants to fully comply with the requirements of Agreements, which incorporate the . . . Certificate of Need Conditions . . . ; (2) disgorgement of all excess profits retained by Defendants as a result of its failure to comply with the requirements of the Agreements, as modified by state law, including but not limited to, its failure to provide at least the regional average of charity care to Spokane area indigent patients; and (3) all other contractual and equitable relief available to Plaintiff for Defendants' failure to provide charity care as required by the Agreements.

ECF No. 1 at 8. For its breach of contract cause of action, the Foundation alleges it is entitled to damages "including, without limitation, declaratory and injunctive

relief, specific performance, and restitution/disgorgement." *Id.* at 10. Finally, in its demand for relief, the Foundation asks the Court to "[e]njoin Defendants from current and future breaches of . . . contract"; "[o]rder disgorgement of all funds retained by Defendants that should have been provided as charity care and/or community benefits under the Agreement, the . . . Certificate of Need conditions and consistent with Washington law"; "[e]nter judgment in favor of the Foundation in an amount to be proven at trial due to Defendants' breach of contract"; and "[a]ward such other relief as is just and proper." *Id.* at 11.

**LEGAL STANDARD**

A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is appropriate if the record establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The moving party has the initial burden of showing no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its burden, the nonmoving party must

point to specific facts establishing a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

"[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249, 252). If the nonmoving party fails to make such a showing for any of the elements essential to its case as to which it would have the burden of proof at trial, the Court should grant the summary judgment motion. *Celotex*, 477 U.S. at 322.

The Court must view the facts and draw inferences in the manner most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Chaffin v. United States*, 176 F.3d 1208, 1213 (9th Cir. 1999). And, the Court "must not grant summary judgment based on [its] determination that one set of facts is more believable than another." *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009).

## DISCUSSION

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995). The Foundation seeks summary judgment on half of the breach element while CHS

seeks summary judgment on that matter as well as the duty and damages elements.

**A.    The contract's essential terms are reasonably definite and certain.**

CHS argues the Certificate of Need's charity care condition is too indefinite and uncertain to enforce. If correct, this would relieve CHS of its duty under that provision.

"[F]or a contract to form, the parties must objectively manifest their mutual assent . . . [and] the terms assented to must be sufficiently definite." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). "[I]f a term is so 'indefinite that a court cannot decide just what it means, and fix exactly the legal liability of the parties,' there cannot be an enforceable agreement." *Id.* (quoting *Sandeman v. Sayres*, 314 P.2d 428, 429 (Wash. 1957)). But "[a]lmost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy." *Trendwest Resorts, Inc. v. Ford*, 12 P.3d 613, 616 (Wash. Ct. App. 2000) (quoting Restatement (Second) of Contracts § 20 cmt. b (Am. Law Inst. 1981)), *rev'd on other grounds*, 43 P.3d 1223 (Wash. 2002).

"Where the parties have intended to finalize a bargain, any uncertainty as to incidental or collateral matters is generally not harmful to the validity of the contract." 25 David K. DeWolf et al., *Washington Practice Series* § 2:27 (3d ed.

rev. 2018) (citing Restatement, *supra*, § 33 cmt. a). "Washington courts do not lightly declare a contract void for lack of certainty but will instead endeavor to discover the true meaning and intent of the parties." *Id.*

Here, section 10.14 provides that "[n]o patient will be turned away because of . . . inability to pay" and CHS "shall use best efforts to cause the Hospitals to continue to provide services to patients covered by the Medicare and Medicaid programs and those unable to pay for emergent or medically necessary care at levels similar to the historic levels of indigent care previously provided by the Hospitals." ECF No. 14-1 at 53. Meanwhile, the Certificate of Need's charity care condition says each hospital "will use reasonable efforts to provide charity care in an amount comparable to or exceeding the average amount of charity care provided by hospitals in the Eastern Washington Region." ECF No. 18-1 at 2–3, 5; ECF No. 61-1 at 2; ECF No. 61-2 at 2. Section 12.24 then provides specific remedies to ameliorate the "irreparable damage [that] would occur in the event that any of the provisions of this Agreement was not performed in accordance with its specific terms or was otherwise breached." ECF No. 14-1 at 65.

The Court must interpret these provisions together. *See City of Union Gap v. Printing Press Props., L.L.C.*, 409 P.3d 239, 251 (Wash. Ct. App. 2018) ("[A] court will view the contract as a whole, interpreting particular language in the context of other contract provisions."), *review denied*, 422 P.3d 914 (Wash. 2018). Doing so

makes the meaning of these provisions readily ascertainable. A common-sense reading shows the Foundation bargained for, and CHS agreed to use, best efforts to provide a certain level of charity care—a level which the Department then modified and CHS again agreed to provide or, at least, use reasonable efforts to provide. The modified level of charity care automatically became a part of the parties' contract. While the parties now dispute the exact benchmark set by the modified level of charity care, it plainly required a close measure of adherence to the regional average.

Reading these provisions as an average person would read them, the Court discerns a core of common meaning sufficient to both determine CHS's performance with reasonable certainty and give the Foundation a reasonably certain basis for an appropriate remedy. *See generally id.* (stating a court must "read each contract as an average person would read it without giving it strained or forced meaning"). Also, the parties' actions after signing the contract—specifically, CHS's act of receiving and operating the hospitals while providing and reporting some level of charity care, and the Foundation's act of conveying the hospitals and using the sale proceeds to improve regional access to healthcare—show they intended to finalize a bargain including the continued provision of charity care, even if the exact level was unclear. *See generally id.* (stating a court may "consider the actions of the parties subsequent to the signing of the contract as evidence of intent at the time of signing").

Considering all, the Court concludes the contract's essential terms are

reasonably definite and certain.

B.   **The Certificate of Need's charity care condition and section 10.14's change-of-law provision are ambiguous.**

The parties dispute whether, between 2011 and 2016, CHS provided a level of charity care comparable to the regional average. The dispute centers on the appropriate benchmark for measuring whether CHS fulfilled its charity care obligations. First, the parties dispute how to calculate the regional average. The Foundation uses available data from the immediately preceding year. CHS uses available data from a trailing three-year period. Each party provides some evidence that its own calculation is the correct one under the contract and possibly represents the original intent. Second, the parties dispute whether the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), constitutes a change of law that modified CHS's charity care obligations beginning in 2014. Again, each party provides some evidence that its own interpretation is the correct one under the contract and possibly represents the original intent.

"The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996). Such intent "may be discovered not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness

of respective interpretations advocated by the parties.'" *Scott Galvanizing, Inc. v. Nw. EnviroServs., Inc.*, 844 P.2d 428, 432 (Wash. 1993) (quoting *Berg v. Hudesman*, 801 P.2d 222, 228 (Wash. 1990)). Additionally, "[t]rade usage and course of dealing are relevant to interpreting a contract and determining the contract's terms." *Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 47 P.3d 940, 943 (Wash. 2002). "Once a contract is established, usage and custom are admissible into evidence to explain the terms of the contract." *Stender v. Twin City Foods, Inc.*, 510 P.2d 221, 225 (Wash. 1973).

If, after considering the context described above, a contract provision is subject to two or more reasonable interpretations, it is ambiguous and presents a question of fact as to its meaning. *See Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014); *Bort v. Parker*, 42 P.3d 980, 988 (Wash. Ct. App. 2002).

Here, the Certificate of Need's charity care condition says each hospital "will use reasonable efforts to provide charity care in an amount comparable to or exceeding the average amount of charity care provided by hospitals in the Eastern Washington Region." ECF No. 18-1 at 2–3, 5; ECF No. 61-1 at 2; ECF No. 61-2 at 2. After considering the entire context, including the extrinsic evidence the parties have provided, the second half of this provision is subject to two or more reasonable interpretations. Specifically, "comparable to" could reasonably require either

approximation or a close match. Either way, the degree of deviation to be tolerated is not conclusively established. Further, and perhaps more importantly, "average amount" could reasonably require using available data from either the immediately preceding year or a trailing three-year period. Again, each party provides some evidence that its own calculation is the correct one under the contract and possibly represents the original intent. Thus, the Certificate of Need's charity care condition is ambiguous and presents a question of fact as to its meaning.

Additionally, section 10.14's change-of-law provision says "[t]his covenant [regarding charity care] shall be subject in all respects to changes in legal requirements or governmental guidelines or policies (such as implementation of universal healthcare coverage)." ECF No. 14-1 at 54. After considering the entire context, including the extrinsic evidence the parties have provided, this provision is subject to two or more reasonable interpretations. Specifically, in the event this provision is triggered—a question of fact the parties dispute—this provision could reasonably be interpreted as either absolving CHS of its charity care obligations or reducing its obligations to reflect new charity care needs. Again, each party provides some evidence that its own interpretation is the correct one under the contract and possibly represents the original intent. Thus, section 10.14's change-of-law provision is ambiguous and presents a question of fact as to its meaning.

Summary judgment is inappropriate where, as here, "the contract terms are

ambiguous so that it is necessary to determine the intent of the parties to the contract," "evidence of the custom and usage of the trade is required in order to interpret an agreement," and "there is a factual dispute regarding . . . the scope of an agreement" as well as "whether a contract has been . . . subsequently altered." 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2730.1 (4th ed. rev. 2018). Moreover, "factual disputes concerning the occurrence . . . of the alleged breach itself may prevent summary judgment from being entered." *Id.* Because there are genuine disputes over material facts concerning the breach element of the Foundation's claim, the Court denies summary judgment on that element.

**C.     The Foundation may seek an equitable remedy.**

        CHS argues the Foundation is entitled to no relief. The contract provides "the parties shall be entitled . . . to enforce specifically the terms and provisions hereof . . . in addition to any other remedy to which they are entitled at law or in equity." ECF No. 14-1 at 65.

**1.     The Foundation may not recover under a traditional damages theory.**

        The purpose of damages in a breach of contract action is "the awarding of a sum which is the equivalent of performance of the bargain—the attempt to place the plaintiff in the position he would be in if the contract had been fulfilled." *Rathke v. Roberts*, 207 P.2d 716, 720 (Wash. 1949) (italics omitted) (internal quotation marks omitted). "[R]ecovery is limited to the loss [the plaintiff] has actually

suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken." *Id.* at 721 (internal quotation marks omitted). "Another statement of the rule is that the measure of damages for the breach of a contract is the amount which would have been received if the contract had been kept, which means the value of the contract, including the profits and advantages which are its direct results and fruits." *Id.* (internal quotation marks omitted).

Here, despite its arguments to the contrary, the Foundation does not actually seek damages based on any traditional expectation interest, as defined above. *See* ECF No. 1 at 8, 10–11. While the Foundation bargained for CHS to provide a certain level of charity care to the Spokane community, the Foundation developed no *economic* interest in that benefit. *See* Restatement, *supra*, § 307 cmts. b, d; 12 Arthur L. Corbin, *Corbin on Contracts* § 63.17 (rev. ed. 2018). Therefore, the Foundation may not recover under a traditional damages theory.

### 2. The Foundation may not recover under an unjust enrichment theory.

"[T]he terms 'restitution' and 'unjust enrichment' are the modern designation for the older doctrine of 'quasi contracts,'" which are "obligations created by the law when money or property has been placed in one person's possession, under such circumstances that in equity and good conscience, he ought not to retain it." *Bill v. Gattavara*, 209 P.2d 457, 460 (Wash. 1949). "Unjust enrichment is the

method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). Unjust enrichment requires proof of three elements: "a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Id.* (quoting *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991)).

CHS argues the Foundation cannot meet the elements of unjust enrichment. The Court disagrees. The Foundation conferred the benefit of the hospitals, and the revenue they would generate, upon CHS in exchange for its promise to provide a certain level of charity care, measured by a percentage of that revenue, to the Spokane community. *See Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 102 (Wash. 1943) ("A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, . . . or in any way adds to the other's security or advantage. . . . The word 'benefit,' therefore, denotes any form of advantage." (internal quotation marks omitted)). It would be unjust for CHS to retain the percentage of revenue that the Foundation had earmarked for the Spokane community when it sold the hospitals. *See Young*, 191 P.3d at 1262 ("Unjust enrichment occurs when one retains money or benefits

which in justice and equity belong to another." (quoting *Bailie*, 810 P.2d at 18)).

However, parties to a valid, binding contract may not claim unjust enrichment on the same matters governed by that contract. *See Chandler*, 137 P.2d at 103; *see also Mastaba, Inc. v. Lamb Weston Sales, Inc.*, 23 F. Supp. 3d 1283, 1295–96 (E.D. Wash. 2014). Here, the Foundation seeks restitution or disgorgement of all excess profits CHS retained as a result of its failure to comply with the charity care condition. ECF No. 1 at 8, 10–11. But the parties have a valid, binding contract and the Foundation's claim that CHS unjustly enriched itself concerns the same matters governed by that contract. Thus, the Foundation may not recover under an unjust enrichment theory.[1]

### 3. The Foundation may obtain equitable monetary relief in lieu of specific performance.

CHS argues that, although the contract provides for specific performance, the Foundation is not entitled to this remedy because some form of damages is adequate. Generally, "[s]pecific performance . . . will not be ordered if damages would be adequate to protect the expectation interest of the injured party." Restatement, *supra*, § 359. And, as CHS notes, "the parties cannot vary by agreement the requirement of inadequacy of damages." *Id.* § 359 cmt. a. Therefore,

---

[1] This is not to say that restitution and disgorgement are not helpful concepts in crafting some other form of equitable relief. On the contrary, these concepts could prove to be of paramount importance.

the Court must analyze whether damages are adequate.

"When a court's legal powers cannot adequately compensate a party's loss with money damages, then a court may use its broad equitable powers to compel a party to specifically perform its promise." *Crafts v. Pitts*, 162 P.3d 382, 386 (Wash. 2007). "When determining whether damages would provide adequate compensation, courts inquire as to (i) the difficulty of proving damages with reasonable certainty, (ii) the difficulty of procuring a suitable substitute, and (iii) the likelihood that an award of damages could not be collected." *Id.* (citing Restatement, *supra*, § 360). "There is . . . a tendency to liberalize the granting of equitable relief by enlarging the classes of cases in which damages are not regarded as an adequate remedy." Restatement, *supra*, § 359 cmt. a. "Doubts should be resolved in favor of the granting of specific performance . . . ." *Id.*

"Where the promisee intends to make a gift of the promised performance to the beneficiary, the beneficiary ordinarily has an economic interest in the performance but the promisee does not." *Id.* § 307 cmt. d. If so, "the promisee's remedy in damages is not an adequate remedy . . . and specific performance may be appropriate."[2] *Id.*

---

[2] "Where specific performance is otherwise an appropriate remedy, . . . the promisee . . . may maintain a suit for specific enforcement of a duty owed to an intended beneficiary." Restatement, *supra*, § 307. "Even though a contract creates a duty to a beneficiary, the promisee has a right to performance." *Id.* § 307 cmt. b. "The promisee cannot recover damages suffered by the beneficiary, but the promisee is a

As discussed above, while the Foundation bargained for CHS to provide a certain level of charity care to the Spokane community, the Foundation developed no *economic* interest in that benefit. Moreover, the Foundation's consequential damages, including how CHS's alleged breach of contract impacted the Foundation's grantmaking, is exceedingly difficult to prove with reasonable certainty. *See* ECF No. 61-9 at 11–12. Indeed, "[t]he precise way in which the grantmaking would have been different or the different dollar amounts spent cannot be determined in hindsight." *Id.* at 12. For these reasons, damages are not an adequate remedy.

"[T]he trial court has broad discretionary authority to fashion equitable remedies . . . ." *Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship*, 242 P.3d 1, 11 (Wash. Ct. App. 2010). "[A] court of equity . . . can and will grant whatever relief the facts warrant, including the granting of legal remedies." *Zastrow v. W.G. Platts, Inc.*, 357 P.2d 162, 165 (Wash. 1960). Thus, a court may grant a combination of specific performance and damages where appropriate. *See* Restatement, *supra*, § 359 & cmt. b, illus. 1. Or, where specific performance becomes impractical or impossible, "the trial court ha[s] authority to award damages in lieu of specific

proper party to sue for specific performance if that remedy is otherwise appropriate . . . ." *Id.* This is so because "[a] party to a contract is entitled to enforce it and to sue in his own name." *Kim v. Moffett*, 234 P.3d 279, 284 (Wash. Ct. App. 2010).

performance."[3] *Zastrow*, 357 P.2d at 165; *see also King Aircraft Sales, Inc. v. Lane*, 846 P.2d 550, 552, 555–56 (Wash. Ct. App. 1993) (citing *Zastrow*, 357 P.2d 162; *Welts v. Paddock*, 247 P. 953 (Wash. 1926); and *Morgan v. Bell*, 28 P. 925 (Wash. 1892)). A court will "consider these 'damages' as equitable compensation similar to an accounting between the parties since the court through specific performance confirms the contract and accommodates the breach." *Carpenter v. Folkerts*, 627 P.2d 559, 563 (Wash. Ct. App. 1981).

Here, the Foundation seeks specific performance and restitution or disgorgement of all excess profits CHS retained as a result of its failure to comply with the charity care condition. ECF No. 1 at 8, 10–11. But because CHS sold the hospitals to MultiCare Health System after the Foundation filed this action, specific performance is no longer available against CHS.[4] The Court need not outline the precise contours of what equitable relief it could fashion if the Foundation were to prevail at trial. It suffices that the Court could award the Foundation equitable

---

[3] A showing that the promisor wrongfully caused the impossibility is not required, *see* Corbin, *supra*, § 63.24, though it certainly tips the scales of equity in the promisee's favor, *see Zastrow*, 357 P.2d at 165.

[4] CHS argues the Foundation cannot obtain equitable monetary relief because, by the time it filed this action, it already knew specific performance was impossible. *See* Corbin, *supra*, § 63.24. But when the Foundation filed the complaint, all it knew was that "CHS ha[d] *announced* a sale of the hospitals to Multicare Health System." ECF No. 1 at 9 (emphasis added). The sale was not yet finalized. *See* ECF No. 51-3 at 3; ECF No. 63-16 at 19; ECF No. 69-8 at 6. Surely, these facts did not deprive the Court of the equitable jurisdiction it would otherwise have.

monetary relief in lieu of specific performance.[5]

**D.    The Foundation has constitutional standing.**

The Court previously granted the Washington State Attorney General's Office leave to file an amicus curiae brief addressing whether the Foundation has "standing." ECF No. 75. As CHS notes, the Attorney General did not address whether the Foundation has constitutional standing. Instead, the Attorney General discussed the Foundation's statutory right to enforce CHS's charity care commitments, an issue which neither party raised. CHS disputes this analysis and argues the Foundation would lack constitutional standing on any statutory basis. But CHS does not dispute that the Foundation has constitutional standing to claim a breach of a contract to which it is a party. And indeed, the Court assures itself that the Foundation does, in fact, have constitutional standing on this basis. *See generally Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (reciting the elements of constitutional standing as follows: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

---

[5] "There are cases in which justice requires the payment of damages, even though the promised performance is impossible . . . ." Corbin, *supra*, § 64.10. This might be such a case because, while "[i]t is a general rule that the promisee, as well as the beneficiary, has a right against the promisor," DeWolf, *supra*, § 12:6 (citing *Plese-Graham, LLC v. Loshbaugh*, 269 P.3d 1038 (Wash. Ct. App. 2011)), here, section 12.23 strips third-party beneficiaries of any such rights, leaving the Foundation as the sole party capable of enforcing CHS's charity care obligations, *see* ECF No. 14-1 at 65.

defendant, and (3) that is likely to be redressed by a favorable judicial decision").

Accordingly, **IT IS HEREBY ORDERED**:

1.  Plaintiff's motion for partial summary judgment, **ECF No. 50**, is **DENIED**.

2.  Defendants' motion for summary judgment, **ECF No. 59**, is **DENIED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 27th day of February 2019.

_____
SALVADOR MENDOZA, JR.
United States District Judge